This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:  March 24, 2016**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                         **NO. S-1-SC-34954**

**DANIEL MARSON MURRELL,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Fred Travis Van Soelen, District Judge**

Jorge A. Alvarado, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**DANIELS, Justice.**

{1}     Defendant Daniel Murrell appeals his convictions for felony murder, armed robbery, theft of a credit card, eleven counts of fraudulent use of an illegally obtained credit card, and tampering with evidence. He argues that there was insufficient evidence to support the verdict and that the ineffective assistance of defense counsel requires reversal. We affirm Defendant's convictions by nonprecedential decision. *See* Rule 12-405(B) ("The appellate court may dispose of a case by non-precedential order, decision or memorandum opinion . . . [where t]he issues presented have been previously decided . . . [or t]he presence or absence of substantial evidence disposes of the issue . . . [or t]he issues presented are manifestly without merit.").

**I.     BACKGROUND**

{2}     The charges against Defendant arose from two robberies committed in Clovis, New Mexico, within a two-day period. On January 2, 2013, victim David Shober, who was eighty-four years old at the time of trial, was in his garage when a man with a gun approached him from behind and demanded money. The man hit Shober in the head twice with the gun, knocking him down, and took his wallet. Shober did not get a clear look at his assailant but said that the man wore a bandana over his face and a

hat on his head, and "by the dialect of his voice [Shober] assumed he was a black person." Shober also thought his attacker was about the same height as Shober himself, five feet ten-and-a-half inches, but saw the man only after being knocked to the ground, and because "[the assailant] was in a lunging position, . . . [Shober] never really saw him erect."

{3}     Two days later, on January 4, 2013, a second victim, sixty-one-year-old Joseph Garcia, was attacked when walking down an alley near Allsup's. Garcia's assailant also came up behind him and knocked him down, then took his wallet and cell phone. Garcia described his attacker as a tall black male in his early to middle thirties, wearing a hooded jacket or sweatshirt and a white head covering with black writing on it. Garcia was beaten severely and his jaw was broken. He was prescribed hydrocodone for the pain, and relatives cared for him and ensured that he took his medication as prescribed. On January 7, 2013, Garcia became dizzy, had difficulty breathing, and was given oxygen. After returning to his daughter's house later in the day, he had trouble breathing again and then died suddenly.

{4}     Garcia was in poor health even before the attack and had previously been diagnosed with congestive heart failure. His heart was significantly enlarged, his coronary arteries were narrowed, and he had cirrhosis of the liver. Forensic

pathologist Dr. Katherine Callahan, who performed Garcia's autopsy, testified that pain from his injuries would have increased his heart rate and blood pressure. She concluded that he had suffered "sudden cardiac death" as a result of complications from blunt trauma to the head and chest. She acknowledged that toxicology results showed an elevated level of hydrocodone in his blood, but she did not believe that he had died of an overdose because there was no frothy fluid in his airways and he had remained alert prior to his sudden death, both atypical of an opiate overdose. Further, the blood samples were not a reliable indicator of his hydrocodone levels before death due to post-mortem redistribution of that drug from body tissues to the blood. Dr. Callahan classified Garcia's death as a homicide and opined that despite his poor health he would not have died on January 7, 2013, if he had not received the beating. In contrast, Defendant's expert testified that he believed Garcia's death was attributable to a hydrocodone overdose and not to his injuries. But he agreed with the State that Garcia would still be alive had he not been beaten because he would not have ingested the hydrocodone if he had not suffered injuries from the beating.

{5}     Witness Terrill Smolar testified that Defendant was the assailant in both of these robberies. At about 6:00 a.m. on January 2, 2013, Smolar was at a friend's house when Defendant knocked on the door and asked Smolar to accompany him.

4

With Smolar as his passenger, Defendant drove a red Ford Mustang that belonged to his fiancée. After a few minutes, Defendant pulled into an alley and got out of the car. He returned shortly with a gun and a wallet, resumed driving, and took money and credit cards out of the wallet before throwing it out of the car. He then bought gas and Newport cigarettes with one of the stolen credit cards. In the morning of January 4, 2013, Defendant again picked Smolar up and this time drove to an Allsup's convenience store. Defendant got out of the car, and Smolar drove around the block on Defendant's instructions to move the car. When Smolar returned, he saw Defendant knock Garcia to the ground, hit him twice, and kick him in the face before Garcia "went limp." Defendant got back in the car with a wallet and a knife. Smolar drove away, but when Defendant realized he had dropped his beanie hat at the scene he told Smolar to drive back. When Smolar refused to go back, Defendant threatened him, then switched seats to drive back for the hat himself before dropping Smolar off.

{6} Smolar's testimony was corroborated by independent evidence tying Defendant to the crimes. Police recovered Shober's wallet in the area where Smolar described it as having been discarded. There were seven unauthorized charges on Shober's stolen credit cards. Surveillance video from near the Allsup's store where one of the stolen cards was used showed "an older model" red Ford Mustang there at the time

of the transaction. Video also showed the car traveling around the block, as Smolar described, just before Garcia was attacked on January 4, 2014.

{7} The Mustang was registered to the mother of Defendant's fiancée. Defendant's fiancée lived with him, let him drive her car, and believed that he was using it at the time of the robberies. After Defendant's arrest he called her from jail and told her to clean the car out and keep it inside the garage. She did not do so, and police located the Mustang parked outside Defendant's residence.

{8} The police recovered stolen property belonging to Garcia from the Mustang and from Defendant's room inside the house. Defendant's fingerprints were on a card that had been in Shober's wallet. Other items found by the police included a money order and cell phone that belonged to Garcia, a black and white bandana, a beanie, several garage door openers, and a Newport cigarette butt.

{9} Smolar turned himself in and gave a statement to police before being offered any plea agreement. He later pleaded guilty to his part in the robberies, and in return for his cooperation in Defendant's prosecution the State agreed that he would be released from prison after serving twenty months and would then be on probation for five years.

{10} Defendant's jury found him guilty of felony murder, armed robbery, robbery,

6

theft of a credit card, eleven counts of fraudulent use of an illegally obtained credit card, and tampering with evidence. The robbery conviction merged with the felony murder conviction, and the district court sentenced Defendant as a habitual offender on the remaining charges, for a total sentence of life in prison plus thirty-one years.

{11} Defendant appeals his convictions directly to this Court. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court.").

## II. DISCUSSION

{12} Defendant argues first that insufficient evidence supports his convictions and next that, even if supported by sufficient evidence, his convictions must be reversed because he was denied effective assistance of counsel.

## A. Sufficient Evidence Supports Defendant's Convictions

{13} Defendant does not argue that the acts constituting armed robbery, robbery, theft of a credit card, fraudulent use of an illegally obtained credit card, and tampering with evidence did not occur but asserts that the State failed to present sufficient evidence that it was he, rather than Smolar, who committed those crimes.

{14} "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a

7

reasonable doubt with respect to every element essential to a conviction." *State v. Cabezuela*, 2015-NMSC-016, ¶ 14, 350 P.3d 1145 (internal quotation marks and citation omitted). Substantial evidence is evidence acceptable to a reasonable mind as adequate to support a conclusion. *State v. Arredondo*, 2012-NMSC-013, ¶ 10, 278 P.3d 517. This Court reviews the sufficiency of the evidence to support a conviction by viewing it "in the light most favorable to the State, resolving all conflicts and making all permissible inferences in favor of the jury's verdict." *State v. Consaul*, 2014-NMSC-030, ¶ 42, 332 P.3d 850 (internal quotation marks and citation omitted).

**1.    Identity**

{15}    Defendant admits that he drove the car and handled some of the evidence, but he maintains that not he but Smolar attacked Garcia and Shober. Defendant argues that Smolar should not be deemed a credible witness against him because Smolar also admitted to being present when the robberies occurred, could have fit the descriptions given of the assailant, and had a motive to shift the blame. Defendant contends that Smolar's testimony should be disregarded and that without this testimony, on which the State heavily relied, there is insufficient evidence to support the jury's verdict.

{16}    The law is clear in New Mexico that the factfinder is the judge of credibility, and this Court will not reweigh the evidence. *See State v. Garcia*, 2011-NMSC-003,

8

¶ 5, 149 N.M. 185, 246 P.3d 1057 ("New Mexico appellate courts will not invade the jury's province as fact-finder by second-guess[ing] the jury's decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] its judgment for that of the jury." (alterations in original) (internal quotation marks and citation omitted)).

{17}     Additionally, Smolar's testimony was corroborated by independent evidence and is controverted only by arguments made by defense counsel. Surveillance video confirmed Smolar's description of the car traveling around the Allsup's store at the time Garcia was attacked. Defendant's fingerprints were on a card taken from Shober's wallet, and several pieces of evidence, including some clearly connected to both robberies, were found at Defendant's residence. The totality of the evidence was sufficient to support the jury's conclusion that it was Defendant who attacked and robbed Shober and Garcia.

**2.     Causation**

{18}     Defendant argues further that even if he was properly convicted for robbing Garcia, the State did not present sufficient evidence that Garcia's death was a homicide caused in the commission of the robbery so as to justify a felony murder conviction. *See* NMSA 1978, § 30-2-1(A)(2) (1994) ("Murder in the first degree is

the killing of one human being by another . . . in the commission of or attempt to commit any felony."). Robbery is a predicate felony that will support a conviction for felony murder if it is committed in a dangerous manner with the requisite mens rea and it is a cause of the homicide. *See* NMSA 1978, § 30-16-2 (1973) (defining robbery as a third-degree felony involving theft "by use or threatened use of force or violence"); UJI 14-202 NMRA (containing the essential elements of felony murder, including that a felony of less than first degree must be committed "under circumstances or in a manner dangerous to human life" and with the intent to kill or knowledge that one's "acts created a strong probability of death or great bodily harm"); *State v. Duffy*, 1998-NMSC-014, ¶¶ 18-28, 126 N.M. 132, 967 P.2d 807 (affirming a conviction for felony murder that occurred when a defendant snatching the purse of an elderly woman knocked her to the ground where the resulting head injury caused her death; and determining that the robbery was an independent felony, that the jury reasonably concluded that the defendant possessed the requisite mens rea, that the crime was committed in a dangerous manner, and that the act of forcefully taking the purse caused the victim to fall and hit her head which resulted in her death), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110.

{19} Despite the severe injuries that were inflicted on Garcia during the attack, Defendant denies that his actions in committing the robbery can be said to have caused Garcia's death three days later. For the purposes of felony murder, the predicate felony must be both the factual and the proximate cause of death. *State v. Montoya*, 2003-NMSC-004, ¶ 11, 133 N.M. 84, 61 P.3d 793; *see also* UJI 14-251 NMRA (Defining proximate cause of homicide as an act that "was a significant cause of death . . . which, in a natural and continuous chain of events, uninterrupted by an outside event, resulted in the [foreseeable] death and without which the death would not have occurred."). Even if another cause may have contributed, Defendant is not relieved "of responsibility for an act that significantly contributed to the cause of the death so long as the death was a foreseeable result of the defendant's actions." UJI 14-252 NMRA. *See also Montoya*, 2003-NMSC-004, ¶ 19 ("In cases where death results from multiple causes, an individual may be a legal cause of death even though other significant causes significantly contributed to the cause of death. Thus, even if the victim is at 'death's door,' a defendant is liable for the victim's death if his act hastens the victim's death." (citation omitted)). Although Garcia already had severe health problems prior to the robbery, "defendants take their victims as they find them." *State v. Romero*, 2005-NMCA-060, ¶ 19, 137 N.M. 456, 112 P.3d 1113.

11

{20} In *Montoya*, we explained that while a defendant's act must be a factual "but for" cause of death, it need not be the only cause. *See* 2003-NMSC-004, ¶ 19 ("'General principles of criminal law do not require that a defendant's conduct be the *sole* cause of the crime.'" (*quoting State v. Simpson*, 1993-NMSC-073, ¶ 14, 116 N.M. 768, 867 P.2d 1150)). We held that there was sufficient evidence to support a felony murder conviction where the defendant had kidnapped an already severely injured victim, driven him in a direction away from the hospital, and left him alone where he bled to death from gunshot wounds. *See id.* ¶¶ 27-30. Despite medical testimony that the victim would probably still have died even if he had been taken directly to a hospital, a jury could reasonably have concluded that the defendant's actions were a significant factual cause of death because they precluded any chance of the victim's survival. *See id.*

{21} Here, there is sufficient evidence that Defendant's actions were a significant cause of Garcia's death. Callahan testified that Garcia had suffered a "sudden cardiac death" classified as a homicide because it was the result of physical stress to his heart caused by the pain he experienced from the injuries inflicted during the robbery. This expert testimony alone is substantial evidence on which a reasonable jury was entitled to rely in finding that Defendant's violent acts during the commission of the robbery

were a significant cause of Garcia's death and therefore that Defendant was guilty of felony murder.

{22}     While Defendant's expert offered a contrary opinion that a hydrocodone overdose rather than cardiac arrest was the ultimate cause of Garcia's death, the conflicting testimony of experts must be resolved by the jury. *See State v. Hughey*, 2007-NMSC-036, ¶ 15, 142 N.M. 83, 163 P.3d 470. Additionally, Defendant concedes that Garcia would not have ingested the hydrocodone and died when he did had he not been attacked and severely injured, so that even under Defendant's theory of the case a reasonable jury could still have concluded that his actions were a significant cause of Garcia's death. *See Montoya*, 2003-NMSC-004, ¶ 19 ("[A] defendant is a but for cause of death if the death would not have occurred at the time it did and in the manner it did but for defendant's actions."); *Romero*, 2005-NMCA-060, ¶¶ 17, 19-20 (stating that a jury would not entertain any reasonable doubt that the defendant's acts were a significant cause of the victim's death when she died after being beaten by the defendant, even though the victim's drunken state and preexisting liver condition had rendered her more susceptible to the beating that was not so severe to ordinarily have caused death); *State v. Ewing*, 1968-NMCA-071, ¶¶ 4-6, 79 N.M. 489, 444 P.2d 1000 (affirming a conviction for second-degree murder and

holding that there was substantial evidence that gunshot wounds caused a victim's death when the shots themselves were not fatal but where treatment of the resulting injuries by insertion of a tracheotomy tube caused an infection in the area of the insertion that spread to the victim's brain).

**{23}** We conclude that sufficient evidence supports Defendant's convictions.

**B.      Defendant Has Not Shown That His Counsel Was Ineffective**

**{24}** Even though his convictions are supported by sufficient evidence, Defendant asks this Court to overturn the jury's verdict and order a new trial based on ineffective assistance of counsel. "To establish ineffective assistance of counsel, a defendant must show: (1) 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" *State v. Paredez*, 2004-NMSC-036, ¶ 13, 136 N.M. 533, 101 P.3d 799 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

**{25}** "Claims of ineffective assistance of counsel are reviewed de novo." *State v. Tafoya*, 2012-NMSC-030, ¶ 59, 285 P.3d 604. But because the record on direct appeal is often inadequate to evaluate counsel's performance or to determine prejudice, we prefer these claims to be brought in a habeas corpus proceeding where evidence can be presented regarding defense counsel's actions. *State v. Astorga*,

14

2015-NMSC-007, ¶ 17, 343 P.3d 1245. "Absent a prima facie case, we presume that counsel's performance was reasonable," and we will not remand to the district court on direct appeal without the benefit of a habeas record. *Id.*

{26} Defendant's central claim is that his counsel should have moved to sever the charges related to Shober from those pertaining to Garcia because the evidence was not cross-admissible and joinder of the offenses allowed the jury to consider propensity evidence that was unfairly prejudicial. However, Shober's testimony reflected that the height of his attacker was closer to Smolar's height of five feet nine inches than to Defendant's height of six feet three-or-four inches. Defense counsel could rationally have concluded that this weakness might undermine the credibility of Smolar's testimony regarding the deadly attack on Garcia that resulted in the most serious charge. Additionally, the similarity of these crimes extended beyond the nature of the charges and could have rendered much of the evidence cross-admissible to prove the identity of the perpetrator. *See State v. Lovett*, 2012-NMSC-036, ¶ 40, 286 P.3d 265 ("[E]vidence is cross-admissible to prove identity when it demonstrates a unique or distinct pattern easily attributable to one person." (internal quotation marks and citation omitted)). Both victims were elderly men who were attacked in broad daylight two days apart in the same area of Clovis, New Mexico, and each

described his attacker as a black man wearing a bandana who approached from behind, hit him in the head, knocked him down, and took his wallet. Much of the evidence was obtained from one location, and both cases would have involved the presentation of largely the same witnesses. Considering the available evidence on each charge and the probability that much of that evidence would have been cross-admissible if the crimes had been tried separately, defense counsel's choice not to move for severance was a reasonable trial tactic. "A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct." *Astorga*, 2015-NMSC-007, ¶ 18 (internal quotation marks and citation omitted).

{27} Defendant argues further that his counsel failed to adequately cross-examine Smolar or to present evidence probative of Smolar's guilt and failed to intervene when the prosecutor attempted to influence prospective jury members or when a juror fell asleep at trial. He contends that the cumulative impact of these failures deprived him of a fair trial but fails to specify how he was prejudiced by these alleged deficiencies. Because the record does not allow us to adequately evaluate these claims on direct appeal, we hold that Defendant has not made a prima facie case of ineffective assistance of counsel.

16

**III.  CONCLUSION**

{28}  Sufficient evidence supports the jury's verdict. We affirm Defendant's convictions.

{29}  **IT IS SO ORDERED.**

_____
                                                    **CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**JUDITH K. NAKAMURA, Justice**

17